**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lorraine Patterson,<br><br>Plaintiff,<br><br>v.<br><br>Carla Miller; Patty Nelson-McCall; Lindsey Romero; Joanne Mathlin; Karen Youngman; John and Jane Does 1-50,<br><br>Defendants. | No. CV-15-00321-PHX-NVW<br><br>**ORDER** |

Before the Court is Defendants Carla Miller ("Miller"), Patty Nelson-McCall ("Nelson-McCall"), Lindsey Romero ("Romero"), Joanne Mathlin ("Mathlin"), and Karen Youngman's ("Youngman") (collectively, "State Defendants") Motion for Summary Judgment (Doc. 172). For the reasons stated below, the motion shall be granted.

## I.    SUMMARY JUDGMENT STANDARD

A motion for summary judgment tests whether the opposing party has sufficient admissible evidence to merit a trial. Summary judgment should be granted if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that might affect the outcome of the suit under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[1]

---

[1] Unless otherwise indicated, in citing cases, all internal quotation marks, citations, emphases, alterations, and footnotes are omitted.

The moving party has the burden of showing the absence of genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant shows an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant, which must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmoving party cannot rest on the pleadings and must do more than simply show there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, conclusory and speculative testimony, whether contained in affidavits or moving papers, is insufficient to raise genuine issues of fact. *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979); *see also Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003) (noting a motion for summary judgment cannot be defeated with "allegations in the complaint, or with unsupported conjecture or conclusory statements").

In fulfilling these burdens, the parties must present admissible evidence. *See Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment."). A party contending a fact is or cannot be genuinely disputed must support the contention by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1); *see also* LRCiv 56.1(a)-(b). A party may object that the material cited to support or dispute a fact is inadmissible. Fed. R. Civ. P. 56(c)(2). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, a court must view the evidence in the light most favorable to the nonmoving party, not weigh the evidence or assess its credibility, and draw all justifiable inferences in favor of the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255.

However, it is not a court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). When the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587.

## II.     BACKGROUND

### A.     Undisputed Material Facts

On March 5, 2013, the Arizona Child Protective Services (CPS)[2] Hotline (the "Hotline") received a report which detailed allegations concerning Plaintiff Lorraine Patterson ("Lorraine") and her daughter, Michelle Patterson ("Michelle"), who at the time was 16 years old. (Doc. 172-1, Exhibit ("Ex.") 6; Doc. 172-2, Ex. 8.) Those allegations, which are contained in the "Reported Maltreatment" section of an intake summary dated March 7, 2013, are listed below:

> For the past several weeks Michelle had been living with her adult sister. Yesterday (3-4-13) the mother refused to sign a POA or guardianship paperwork to continue to allow Michelle to live with the sister. The mother wants Michelle returned to her care however Michele disclosed that she is extremely fearful to be in the mother's home because of the mother's ongoing mental health issues. It was reported that the mother picked Michelle up from the sister's home yesterday and took her to a local crisis center where she stayed the night, reason unknown. Michelle would like to return to either her sister's care or the crisis center. It is unknown if the mother will allow this.
>
> The mother has had mental health issues all of her life. The mother is on disability because of PTSD. It is unknown if the mother is receiving treatment for her mental health issues. The mother does take prescription medication, type unknown. It was reported that the mother regularly threatens to kill herself in front of Michelle. Michelle is very stressed and "doesn't feel safe" at the mother's home. The mother states that Michelle has medical issues such as digestive problems and thyroid issues. These medical issues have not been diagnosed. The mother feels Michelle is overweight and gives her a large amount of laxatives a day. It was reported

---

[2] CPS is now known as the Arizona Department of Child Safety.

that because of the laxatives she is being given she is now dependent on them. Michelle has also bought diet pills off the internet in order to lose weight.

The mother had her now adult children removed from her care in New Mexico because of her mental health issues.

(Doc. 172-1, Ex. 6.)  But that was not all, as that same intake summary included a statement from a school counselor, which states, in part:

Today, Michelle reported she no longer wants to live with her mom, she is agitated and fed up with life at home, it's chaotic, mom screams all the time, there are negativity in the home, no specifics.  The two adult sisters are seeking to take custody of her because they went through this type of home with their mom.  Michelle said she has to be out of her house immediately.

(*Id.*)  The intake summary additionally included allegations from an unidentified "second source," which are substantially similar to those previously detailed.  (*Id.*)  An investigation soon after commenced.  (*Id.*; Doc. 185, Ex. 21.)

Two days later, Linda Morris ("Morris"), Michelle's adult sister, filed—and the Hotline received—a dependency petition (the "March Dependency Petition") in the Superior Court of the State of Arizona in and for Maricopa County, Juvenile Division (the "Juvenile Court").  (Doc. 172-1, Exs. 2, 4.)  The petition alleged, in part:

Upon information and belief, Mother is neglecting her child due to substance abuse and/or mental illness.  Upon information and belief, Mother has substance abuse issues involving prescription medication, has an eating disorder, and other medical ailments that limit her ability to provide effective parental care and control.

The child, who is 16 years of age, has recognized the same and conveyed her concerns to her school counselor and teachers.  Michelle has also announced that she refuses to go home in light of Mother's issues and would rather live in a shelter than with Mother.

(Doc. 172-1, Ex. 2 (emphasis omitted).)    Morris argued Michelle "should be made a temporary ward of the Court, committed to the continued care, custody and control of the Arizona Department of Economic Security[3] . . . ."  (*Id.*)    These allegations were

_____

[3] The Arizona Department of Economic Security ("ADES") was the agency that

substantially reproduced in an intake summary dated March 14, 2013. (Doc. 172-1, Ex. 4.)

A week later, Romero and Nelson-McCall entered the fray, submitting a "Report to the Juvenile Court for Preliminary Protective Hearing and/or Initial Dependency Hearing" ("the March 2013 Report").[4] Under the "Reason for CPS Involvement" section and the subsection thereof titled "Why temporary custody was necessary," Romero summarized[5] the allegations in the March Dependency Petition. (Doc. 185, Ex. 10 ("The CPS Hotline received the following report on 03/13/2013: Private Dependency Petition received at the Child Abuse Hotline on 3/7/2013 in regards to Michelle. The dependency petition states . . . .").) Under the "Parent/guardian/custodian's verbal or written response to the allegations" subsection, she indicated she interviewed Lorraine regarding the allegations and that Lorraine said she had signed a "temporary custody document" and agreed to "sign over permanent guardianship" to Morris. (*Id.*) Romero, in the subsection titled "Describe the need, if any, for continued temporary custody," wrote "[c]ontinued temporary custody is needed due to mom refusing Michelle to come home, she is willing to let Michelle stay with her adult daughter permanently." (*Id.*)

The Juvenile Court held a "Preliminary Protective Hearing" regarding the March Dependency Petition on March 15, 2013.[6] Lorraine, her counsel, and Michelle were present, among others. (Doc. 172-4, Ex. 19.) The Juvenile Court noted that Linda filed a temporary guardianship petition, Lorraine consented to the guardianship, and they both housed CPS.

---

[4] The face of the March 2013 Report does not conclusively indicate whether it was actually filed with the Juvenile Court. This is also the case for the other, similarly styled reports CPS authored between May 2013 and July 2014. (*See* Doc. 172-2, Exs. 7, 9-10.) For example, while the March Dependency Petition is marked by a stamp indicating the date on which it was filed, no such stamp can be found on the March 2013 Report. (*See* Doc. 172-1, Ex. 2; Doc. 185, Ex. 10.) However, neither Lorraine nor State Defendants dispute these reports were filed with the Juvenile Court. It is accordingly undisputed that these reports were filed with the Juvenile Court.

[5] While both Romero and Nelson-McCall submitted the March 2013 Report, Romero authored the report and Nelson-McCall approved it.

[6] While numerous minute entries reflecting Juvenile Court hearings were produced by Lorraine and State Defendants, the record is devoid of transcripts of these hearings.

agreed "that a Petition for Permanent Appointment of Guardianship shall be filed instead." (*Id.*) The Juvenile Court dismissed the March Dependency Petition. (*Id.*)

However, the conflict did not end there, as Morris later filed another dependency petition, which CPS received on May 9, 2013. (Doc. 172-1, Ex. 5.) This petition (the "May Dependency Petition") is not in the record. An intake summary dated May 16, 2013, under the "Reported Maltreatment?" section, states:

> A private dependency petition was received on 5/9/13 via e-mail. Per documentation, the petitioner is Linda Morris.

> Per documentation the mother is neglecting her child due to substance abuse and/or mental illness. The mother has substance abuse issues involving prescription medications. The mother has an eating disorder, and medical aliments [sic] that limit her ability to provide effective parental care and control. Michelle refuses to go home in light of the mothers [sic] issues and would rather live in a shelter than with the mother. The child feels unsafe and refuses to return to the mother's residence.

(*Id.*) It additionally provides:

> The supplemental orders are as follows:

> It is ordered that the child is placed in the temporary physical custody of Linda Morris. The court finds at this time, that continuation of the children in the home would be contrary to the welfare of the children based upon the contents of the verified petition alleging: risk of abuse or neglect, unfitness of the home environment for the children, substance abuse issues, mental health issues, and unwillingness or inability of the parents to care for the children.

> Based on the above information the court hearings are as follows:

> Preliminary Protective Conference is set for May 14, 2013 at 2:15pm and Preliminary Protective Hearing set for May 14, 2013, at 3:00pm . . . ."

On May 13, 2013, Romero and McCall submitted a "Report to the Juvenile Court for Preliminary Protective Hearing and/or Initial Dependency Hearing" (the "May 2013 Report"). Under the "Reason for CPS Involvement" section and the subsection thereof titled "Why temporary custody was necessary," Romero summarized[7] the allegations

---

[7] As was the case regarding the March 2013 Report, Romero authored the May 2013 Report and Nelson-McCall approved it.

contained in the May 16, 2013 intake report. (Doc. 172-2, Ex. 7 ("The CPS Hotline received the following report on 5/10/2013 . . . .").) Under the Parent/guardian/custodian's verbal or written response to the allegations" subsection, she indicated she interviewed Lorraine regarding the allegations and that Lorraine denied "all allegations of substance abuse and threatening to kill herself." (*Id.*) Romero also noted "[o]n 3/15/13 at the PPC Ms. Patterson had agreed to sign over guardianship to Linda. This writer was then notified that on 03/26/13, Ms. Patterson had decided not to consent to the guardianship." (*Id.*) In the subsection titled "Describe the need, if any, for continued temporary custody," she wrote "[c]ontinued temporary custody is needed due to Michelle refusing to return home due to mom's behaviors." (*Id.*) Romero concluded:

> It is this writer's opinion that Michelle remain placed with her adult sister. Michelle has been doing very well and has a healthy and positive relationship with her sister. Ms. Patterson has been going back and forth on signing over guardianship and has not yet signed the documents as she has said she would. On 4/26/13 Ms. Patterson did not sign the guardianship papers. She had originally agreed to sign at the PPC on 3/15/13. Michelle reports that her mother is unpredictable with her mood swings. Mother is also reported to have a lot of health issues for which she is taking a lot of medication. Michelle reports that these conditions make it difficult to live with her mother. It does appear that the family tried to handle the situation without court intervention and Ms. Patterson became uncooperative. At this time it does appear there is a need for court intervention to ensure Michelle's well-being at this time.

(*Id.*)

The Juvenile Court held a "Preliminary Protective Hearing" concerning the May Dependency Petition on May 14, 2013. Lorraine, her counsel, and Michelle (among others) were again present. (Doc. 172-4, Ex. 14.) There, CPS moved to join the May Dependency Petition as a co-petitioner and Lorraine sought to contest the allegations therein. (*Id.*) The Juvenile Court granted the motion and entered a denial to the May Dependency Petition on Loraine's behalf. (*Id.*)

In June 2013, CPS concluded the allegations regarding Lorraine were unsubstantiated, finding "[u]pon investigation, it was unable to determine if Michelle has

been emotionally abused by [Lorraine]" and "[a]llegations of neglect were not supported. Mom denied any neglect or any emotional abuse, child was with adult sister at this time with permission from mother with intent to sign over guardianship to adult sister." (Doc. 172-4, Ex. 17.)   On July 18, ADES moved the Juvenile Court for leave to file a first amended dependency petition "in order to remove all allegations regarding the mother, leaving the allegation that mother is unable to parent due to the child's behavior." (Doc. 185, Ex. 23.)  The Juvenile Court granted the motion the next day, (Doc. 185, Ex. 24), and three days later, ADES filed an amended dependency petition (the "Amended Dependency Petition") which alleged, in relevant part:

> Mother is unable to parent due to the child's behaviors.  Mother and the child have a strained relationship.  Prior to the filing of this dependency, the child had been living with her adult sister for several months, and at this time the child refuses to return to her mother's home.  The child adamantly refuses to be parented by mother, and wishes to remain living with her sister.

(Doc. 172-3, Ex. 13.)

On August 20, 2013, the Juvenile Court conducted a "Contested Dependency Hearing." (Doc. 172-4, Ex. 15.)  Among those present were Lorraine, her counsel, Romero, Mathlin, Morris, and Michelle.  (*Id.*)  After ADES presented its case (which included four exhibits and testimony from Mathlin) and Lorraine did the same, the Juvenile Court found "the State has demonstrated by a preponderance of the evidence that the mother is unable to parent solely due to the child(ren)'s behaviors" and that Michelle was dependent. (*Id.*)  Thereafter, Lorraine's counsel moved for an evidentiary hearing, which the Juvenile Court denied.  (*Id.*)  In addition, the Juvenile Court ordered that both Lorraine and Michelle were entitled to receive a psychological evaluation and individual counseling and indicated the case plan going forward was family reunification.  (*Id.*)  A hearing was scheduled for January 21, 2014.  (*Id.*)

In the interim, the Arizona Supreme Court Foster Care Review Board (the "FCRB"), which was charged with periodically reviewing Michelle's case, (Doc. 172-4, Ex. 15), issued findings and recommendations on October 4, 2013.  After considering a statement

from Lorraine's counsel, a written statement from Mathlin, and numerous reports and minute entries from the Juvenile Court, the FCRB recommended that Mathlin change the case plan for Michelle from family reunification to independent living. (Doc. 172-4, Ex. 21.) It supported its recommendation by noting Lorraine "has not demonstrated her commitment toward family reunification with Michelle," Michelle "does not desire to have contact" with Lorraine, and Lorraine "has not addressed the issues which brought Michelle into care." (*Id.*)

Mathlin's written statement was attached to the FCRB report. Therein, Mathlin praised Michelle's functioning and stated she "is not ready to have contact with her mother," "is disturbed by her mother's constant texting," and "reports her mother affected her self-esteem and caused her to have body image issues." (*Id.*) Mathlin additionally informed the FCRB that although Lorraine was provided individual counseling per the Juvenile Court's instructions, she cancelled her appointment, "as she believes she does not need counseling." (*Id.*) Mathlin reported concern that Lorraine was dwelling on "historical family issues" and was not focused on restoring her relationship with her daughter. (*Id.*)

Later that month, Lorraine filed with the Juvenile Court a document titled "Objections and Corrections to the Report of the Child Welfare Caseworker, Statement of Facts, and a Request to Move Case to a Different Court," which raised objections to the Juvenile Court proceedings and Romero and Nelson-McCall's reports. (Doc. 172-3, Ex. 12.) Attached were numerous exhibits, many of which Lorraine also filed in this litigation. (*Id.*) The Juvenile Court found the objections were filed *ex parte* and took no action thereon. (Doc. 172-5, Ex. 24.)

This was neither the first nor last time Lorraine assumed an active role in the dependency proceeding. Indeed, even though she consistently had representation, Lorraine frequently contacted State Defendants and non-parties alike, mostly to either object to procedural aspects of the proceeding or share her views on her fitness as a parent, Michelle's welfare, or other matters.[8] (*E.g.*, Doc. 185, Exs. 35, 38-39.) State Defendants

_____

[8] One of Lorraine's attorneys, Carol Carter, frequently communicated with counsel

largely acknowledged her messages. (*See, e.g.*, Doc. 185, Ex. 38 ("I [Romero] have received your messages and my supervisor and I are aware of the concerns you have brought up concerning the placement of Michelle.").) They also discussed the case amongst themselves and their counsel. (*E.g.*, Doc. 185-1, Exs. 46-47.)

In advance of the next hearing, Mathlin and Youngman submitted a "Progress Report to the Juvenile Court" on January 7, 2014 (the "January 2014 Report").[9] Under the "Reason for CPS Involvement" section and the subsection thereof titled "Brief statement of grounds for petition," Mathlin summarized the allegations contained in the May 16, 2013 intake report. (*See* Doc. 172-2, Ex. 9 ("The CPS Hotline received the following report on 5/10/2013: . . . .").) Throughout the report, Mathlin noted Michelle did not wish to be parented by Lorraine. (*See, e.g.*, *id.* ("Michelle is unwilling to be parented by her mother Ms. Lorraine Patterson and she refuses all contact with her mother at this time.").) Mathlin also reported Michelle had been evaluated by a "Dr. Bluth" and was diagnosed with post-traumatic stress disorder.[10] (*Id.*) In addition, she reported Lorraine "has failed to participate in reunification services." Mathlin concluded:

> Ms. Patterson has not participated in reunification services and her behaviors have further alienated her daughter. Michelle is now expressing fear of her mother and she is unwilling to be parented by her mother. Dr. Bluth notes that he would not recommend reunification unless Ms. Patterson has fully participated in the case plan and is demonstrating behavioral change. He further opined that reunification would also be contingent on whether Michelle is desirous of being reunified with her mother.
>
> The department is concerned that there has been no progress towards reunification and it does not appear that reunification will be achieved in the foreseeable future. Michelle is diagnosed with PTSD and her mother's behaviors are triggers for her anxiety. Given Michelle's age, functional

---

for ADES in advance of the August 20, 2013 hearing and, on at least one occasion, attached documents to support Lorraine's case. (Doc. 185, Exs. 25, 27.)

[9] Mathlin authored the January 2014 Report and Youngman approved it.

[10] State Defendants and Lorraine each produced a "Report of Psychological Evaluation" completed by Dr. G. Joseph Bluth ("Dr. Bluth"). (Doc. 172-4, Ex. 16.; Doc. 185, Ex. 18.)

limitations and her focus on achieving educational goals the department recommends the case plan to be changed to Long Term Foster Care . . . .

(*Id.*) On January 16, 2014, Lorraine submitted to the Juvenile Court a "Statement of Facts and Response and Corrections" to the January 2014 Report, which contained many of the same exhibits she submitted months earlier. (Doc. 172-3, Ex. 11.)

The Juvenile Court held a "Report and Review Hearing" and a "Permanency Planning Hearing" on January 21, 2014. Once again, Lorraine, her counsel, and Michelle, among others, were present. (Doc. 185-1, Ex. 56.) The Juvenile Court indicated it had "read and considered the DES caseworker's report dated 1/07/14 and the FCRB report." (*Id.*) The Juvenile Court found Michelle "continue(s) to be dependent" and ordered that the case plan be changed to "family reunification concurrent with long-term foster care." (*Id.*)

The Juvenile Court was not the only court to have reviewed Michelle's case. Indeed, Lorraine appealed the Juvenile Court's dependency determination to the Arizona Court of Appeals, which affirmed it on February 18, 2014.[11] (Doc. 172-1, Ex. 3.) The court found "there was sufficient evidence to support the finding of dependency." (*Id.*)

On July 15, 2014, the Juvenile Court conducted another "Report and Review" hearing, at which the Juvenile Court dismissed dependency proceeding. As an initial matter, the Juvenile Court indicated it had "read and considered the DCS caseworker's report dated 8/10/14." (Doc. 185-1, Ex. 59.) However, this report is not in the record. A "Report to the Juvenile Court for Permanency Hearing" submitted by Mathlin and Youngman and dated July 7, 2014 (the "July 2014 Report")[12] was produced by Lorraine and State Defendants. (Doc. 172-2, Ex. 10; Doc. 185, Ex. 14.) Therein, Mathlin informed

---

[11] Prior to ruling on Lorraine's appeal, the Arizona Court of Appeals indicated it had "received additional documents" from Lorraine, which she ostensibly filed *pro se* even though she was represented by counsel. (*See* Docs. 185-1, Ex. 58 at 2; Doc. 185, Ex. 43 (listing Alison Stavris of the Stavris Law Firm, PLLC as Lorraine's counsel on the appeal).) The documents were not considered. (Doc. 185-1, Ex. 58 at 2 (Any documents that have been filed pro se by Appellant and that are not in the record on appeal, will not be considered by this court in reaching its decision in this case.").)

[12] The July 2014 Report was authored by Mathlin and approved by Youngman.

- 11 -

the Juvenile Court that Michelle would reach the age of majority on August 10, 2014 and "does not wish to return to her mother's care." (*Id.*) She recommended that Michelle remain a ward of the Juvenile Court and be placed in the physical custody of Morris. (*Id.*) She further recommended that the case plan be changed to independent living. (*Id.*)

At the hearing, the Juvenile Court, after noting that Michelle would reach the age of majority on August 10, 2014, dismissed the dependency action and released Michelle from the wardship of the Juvenile Court effective August 10, 2014. (Doc. 185-1, Ex. 59.)

## B. Procedural History

On February 20, 2015, Lorraine initiated this action. The operative complaint[13] (the "Complaint"), brought against State Defendants and numerous fictitious individuals, alleges a claim under 42 U.S.C. § 1983 for violation of her right to be free from deliberately fabricated evidence in a juvenile court proceeding. (Doc. 89.) On October 12, 2017, the Court dismissed the Complaint, which the Court of Appeals reinstated just over a year later. Discovery having been completed, State Defendants' motion seeks summary judgment in their favor.

## III. EVIDENTIARY ISSUES

Lorraine's initial response to the motion (Doc. 182)—which totaled 36 pages and presented no affidavits or admissible evidence—was stricken for violation of the Local Civil Rules. (Doc. 184.) Instead of granting State Defendants' motion, the Court gave Lorraine leave to file a rule-compliant response. Lorraine timely filed a second response roughly three weeks later.

However, the second response presents the same evidentiary deficiencies as the first. Lorraine did not attach a single affidavit to support any of her 104 exhibits,[14] nor did she even attempt to argue why any of them constitute admissible evidence. In addition, she

---

[13] This Order does not purport to detail the entire procedural history of this case, which contains a litany of pleadings, motions, and appeals that are irrelevant to the disposition of the present motion.

[14] While Lorraine attached what appears to be a purported affidavit or declaration from Michelle, (*see* Doc. 185-1, Ex. 63 at 2-3), that document constitutes neither because it is both unsworn and not in the form set forth in 28 U.S.C. § 1746. It is inadmissible.

did not object to the admissibility of any of State Defendants' exhibits. While *pro se* pleadings are subject to "less stringent standards" than those drafted by attorneys, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007), "pro se litigants are not entitled to lenient evidentiary standards for purposes of summary judgment." *Price v. Peerson*, CV 13-3390 PSG (JEMx), 2014 WL 12579823, at *4 (C.D. Cal. May 15, 2014); *see also Jacobsen v. Filler*, 790 F.2d 1362, 1364-65 (9th Cir. 1986) ("First and foremost is that *pro se* litigants in the ordinary civil case should not be treated more favorably than parties with attorneys of record."); *accord Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007) ("A district court does not have a duty to search for evidence that would create a factual dispute . . . even for *pro se* litigants.").

Yet, State Defendants are hardly role models in this regard. While it appears State Defendants objected to the admissibility of Lorraine's exhibits,[15] they too failed to submit affidavits in support of their exhibits. They also did not explain why their exhibits are admissible.

Notwithstanding the parties' failure to address the admissibility of the 129 exhibits they collectively submitted, the Court, mindful that "[t]he Federal Rules of Evidence take a liberal approach in the admission of evidence," *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588 (1993)), will address admissibility *sua sponte*. The parties' exhibits can be organized into five categories, each of which will be addressed below.[16]

### A. Court Records

Both Lorraine and State Defendants produced court records. Most of these are records of the Juvenile Court, which largely consist of minute entries, dependency petitions, and reports submitted by State Defendants. Also included are records of the

---

[15] (*See* Doc. 186 ("To survive a motion for summary judgment, however, Patterson must now provide the admissible evidence to back up her allegations. She has provided no such evidence . . . .").)

[16] Any exhibit that does not fall into one of these categories and is not addressed in this Order is irrelevant and therefore inadmissible. *See* Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").

Arizona Court of Appeals, including that court's decision affirming the dependency determination. With a few exceptions, the Court shall take judicial notice of these records.[17]

A court may take judicial notice of "court filings and other matters of public record," such as orders, pleadings, and memoranda. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006). In addition, a court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992); *see also Guzman v. County of Alameda*, No. C 10-02250 MEJ., 2012 WL 1155535, at *1 n.1 (N.D. Cal. Mar. 30, 2012) (taking judicial notice of "21 documents consisting of transcripts, minute orders, detention reports, petitions, and orders" from a state court dependency proceeding). However, a court may not take notice of a fact in a public record that is subject to reasonable dispute. *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citing Fed. R. Evid. 201(b)).

The Court takes judicial notice of the court records submitted by the parties that directly relate to this action. These records include: the records from the dependency proceeding in the Juvenile Court; the records from the dependency proceeding in the Arizona Court of Appeals; the records from this action in this Court; and the records from this action in the Court of Appeals.[18] These records unquestionably "have a direct relation to matters at issue." *See Robinson Rancheria Citizens Council*, 971 F.2d at 248. Notice will not be taken of facts in these records that are subject to reasonable dispute. *See Lee*, 250 F.3d at 689.

---

[17] A court may take judicial notice on its own and at the summary judgment stage. Fed. R. Evid. 201(c)(1); *see* Fed. R. Evid. 201(d) ("The court may take judicial notice at any stage of the proceeding.").

[18] These records are contained in: Doc. 172-1, Exs. 2-3; Doc. 172-2, Exs. 7-10; Doc. 172-3, Exs. 11-13; Doc. 172-4, Exs. 14-15, 19, and 21; and Doc. 172-5, Ex. 24, as well as Doc. 185, Exs. 1-4, 10-15, 17, 23-24, 26, 32, and 43; Doc. 185-1, Exs. 53-54, 56-59, 62-63, and 86; and Doc. 185-2, Exs. 87 and 92.

1    On the contrary, the Court does not take notice of the various court records
2 submitted by Lorraine that concern other proceedings. For example, Lorraine produced
3 records from two cases before the United States Bankruptcy Court for the District of
4 Arizona. (Doc. 185-1, Ex. 72.) These cases are irrelevant to the issues presented by
5 Lorraine's cause of action.

6    **B. CPS Records**

7    The parties also produced various records generated by CPS, including intake
8 reports, investigation reports, and case notes. These records are admissible.

9    First, the CPS records are authenticated by their distinctive characteristics.
10 Authentication is a condition precedent to admissibility and requires "evidence sufficient
11 to support a finding that the item is what the proponent claims it is" Fed. R. Evid. 901(a).
12 At the summary judgment stage, the focus is on the admissibility of the evidence's
13 contents. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003). "The issue for the trial
14 judge in determining whether the required foundation for the introduction of the evidence
15 has been established is whether the proof is such that the jury, acting as reasonable men,
16 could find its authorship as claimed by the proponent." *United States v. Smith*, 609 F.2d
17 1294, 1301 (9th Cir. 1979). Authenticity may be established through any manner permitted
18 by Federal Rule of Evidence ("FRE") 901(b) or FRE 902.[19] *Orr*, 285 F.3d at 774.

19    One such manner is distinctive characteristics. FRE 901(b)(4) permits
20 authentication by "appearance, contents, substance, internal patterns, or other distinctive
21 characteristics of the item, taken together with all the circumstances." The CPS records
22 are authenticated by their numerous distinctive characteristics, including the appearance of
23 the records and the non-public information concerning the investigation that took place,
24 such as the allegations detailed in the hotline reports and the agency's findings.

25    Second, the CPS records, to the extent they are not offered to prove the truth of an
26 assertion, do not contain hearsay. Hearsay is an out-of-court statement offered for the truth
27 of the matter asserted. Fed. R. Evid. 801(c). "Accordingly, an out-of-court statement is

28
_____
[19] None of the relevant exhibits in the record are self-authenticating.

not hearsay if offered for any purpose other than the truth of whatever the statement asserts." *United States v. Lopez*, 913 F.3d 807, 826 (9th Cir. 2019). For example, "an out-of-court statement introduced to prove that the person to whom the statement was communicated had notice of something" is not hearsay. *United States v. Lane*, No. CR-12-01419-PHX-DGC, 2013 WL 3716601, at *2 (D. Ariz. July 13, 2013) (citing *Kunz v. Utah Power & Light Co.*, 913 F.2d 599, 605 (9th Cir. 1990)). Also, "[o]ut-of-court declarations introduced to show the effect on the listener are not hearsay." *L.A. News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 935 (9th Cir. 2002). Particularly relevant here is the course of investigation exemption, under which out-of-court statements offered to explain the course of an investigation are not hearsay, provided the course of an investigation is relevant to a party's case.[20] *See, e.g.*, *United States v. Johnson*, 875 F.3d 1265, 1279 (9th Cir. 2017) (finding out-of-court statements were relevant to rebutting the defendant's argument that the police "were sloppy and had no reason to investigate" his property). This exemption applies to evidence concerning tips that can "explain the origin and course of an investigation." *United States v. Nosal*, No. CR-08-0237 EMC, 2013 WL 4504652, at *24 (N.D. Cal. Aug. 15, 2013); *see also United States v. Cawley*, 630 F.2d 1345, 1350 (9th Cir. 1980) ("[T]he court may admit such evidence of tips . . . to explain why an officer conducted an investigation as he did.").

The foregoing hearsay exemptions support the admission of the CPS records.[21] For example, statements made in the "Reported Maltreatment" section of the March 7, 2013 CPS hotline report, (Doc. 172-1, Ex. 6), are admissible to show why CPS conducted its investigation and that CPS was on notice regarding the allegations made concerning Lorraine and Michelle. In addition, statements made in the CPS investigation report, (Doc.

---

[20] While the caselaw on this exemption concerns criminal investigations, there is no reason why it should not apply to an investigation conducted by social workers in the context of a dependency proceeding.

[21] These records are contained in: Doc. 172-1, Exs. 4-6; Doc. 172-4, Ex. 17; and Doc. 172-5, Exs. 22-23, and 25, as well as Doc. 185, Exs. 16, 19-21, 33, and 44; and Doc. 185-1, Exs. 44, 48, and 50-52.

172-4, Ex. 17), explain the course of the CPS investigation, as they note the investigation's findings.

**C. E-mails**

A significant number of Lorraine's exhibits are e-mails, the vast majority of which she either sent or received. (Doc. 185, Exs. 8, 25, 27, 31, 35-36, and 38-42; Doc. 185-1, Exs. 45-47, 49-50, and 83; and Doc. 185-2, Exs. 88-89.) State Defendants also produce an e-mail. (Doc. 172-1, Ex. 1.) For the reasons stated below, these e-mails are admissible, albeit on a limited basis.

First, these e-mails are authenticated by their distinctive characteristics. While not one e-mail is accompanied by an affidavit, all of the e-mails can be authenticated under FRE 901(b)(4). Indeed, "[e]-mails and other electronic records are most frequently authenticated under Rule 901(b)(4)." *Jimena v. USB AG Bank, Inc.*, No. 1:07-cv-00367 OWW SKO, 2011 WL 2551413, at *4 (E.D. Cal. June 27, 2011).

The e-mails provide several indicia of reliability to pass muster under this rule. Aside from the fact the e-mails "contain sender, recipient, subject line, and content fields," *see, e.g.*, *Siemens v. Seagate Tech.*, No. SACV 06-788JVS (ANx)., 2009 WL 8762978, at *9 (C.D. Cal. Apr. 27, 2009) (finding such data were "sufficient to establish foundation"), many of the e-mail addresses appear to have been issued from an employer, such as the Arizona Attorney General's Office, (*see, e.g.*, Doc. 185, Ex. 27), or the Arizona Department of Economic Security (*see, e.g.*, Doc. 185, Ex. 25). *See, e.g.*, *La Jolla Spa MD, Inc. v. Avidas Pharms., LLC*, Case No. 3:17-CV-01124-MMA-WVG, 2019 WL 4934178 (S.D. Cal. Oct. 7, 2019) (finding e-mails having addresses that "appear to be issued from an employer and contain the employee's name in the address" were sufficiently reliable and genuine). In addition, many (if not all) of the e-mails cover "an identifiable matter common to both participants in the conversation and refer to nonpublic information"—the dependency proceeding involving Michelle and information relating thereto. *See, e.g.*, *id.*

Second, the content of the e-mails is admissible subject to the rule against hearsay. All of the e-mails written by individuals other than State Defendants are admissible only to the extent they are offered for a purpose other than to prove the truth of a matter asserted or satisfy a hearing exception under FRE 803 or FRE 804. *See* Fed. R. Evid. 801(c)(2). For example, an e-mail from Lorraine to Romero, (Doc. 185, Ex. 35), is admissible to the extent it is offered to prove Romero had notice of its contents. On the contrary, that e-mail is inadmissible if it is offered to establish the truth of a matter asserted therein, such as the notion Michelle was forced to call Lorraine from a phone booth.

All e-mails written by State Defendants and offered against them by Lorraine are admissible, as statements made therein constitute those by a party-opponent under FRE 801(d)(2). For example, an e-mail from Nelson-McCall to Romero and Youngman, (Doc. 185, Ex. 47), is admissible, because Nelson-McCall is one of State Defendants.

### D. Telephone Call Records

Lorraine produced numerous documents concerning telephone conversations ostensibly held between Lorraine and Michelle. (Doc. 185-1, Exs. 65-71.) These documents include various, often unintelligible papers concerning these conversations, (Doc. 185-1, Exs. 65-66), and alleged transcripts of them, along with an undated letter from an audio engineer to an unknown recipient that purports to authenticate the recordings the transcripts apparently derive from. (Doc. 185-1, Exs. 66-71.)

These exhibits are inadmissible, as they cannot be authenticated. First, Lorraine failed to support these exhibits with an affidavit verifying the transcripts. *See* Fed. R. Evid. 901(b). The letter from the sound engineer, (Doc. 185-1, Ex. 66 at 3), cannot authenticate the transcripts because it is unsworn. Moreover, the letter only speaks to the veracity of unspecified recordings and never even mentions the transcripts.[22]

---

[22] Notably, the purported recordings are not in the discovery record. While the Court is in physical possession of two compact discs inside a sleeve labeled "Lorraine Patterson /E2 ADES" that were attached to Lorraine's response to a motion to dismiss (Doc. 39), Lorraine failed to include the recordings among her summary judgment exhibits.

In addition, they cannot be authenticated, as the letter from the sound engineer is unsworn, Fed. R. Evid. 901(b)(1); Lorraine has not produced an opinion identifying either

Second, the transcripts cannot be authenticated under FRE 901(b)(6). Under that rule, a telephone conversation can be authenticated with "evidence that a call was made to the number assigned at the time to . . . a particular person, if circumstances, including self-identification, show that the person answering was the one called." Fed. R. Evid. 901(b)(6)(a); *see also* Fed. R. Evid. 901(b)(6), advisory committee's note to subdivision (b) of 1972 proposed rules ("The cases are in agreement that a mere assertion of his identity by a person talking on the telephone is not sufficient evidence of the authenticity of the conversation and that additional evidence of his identity is required."). There is no such evidence in the record. *See also Logan v. City of Pullman*, 392 F. Supp. 2d 1246, 1252 (E.D. Wash. 2005) (finding a transcript of a telephone call could not be authenticated under FRE 901(b)(6) because the transcript did not "identify the date, the time called, or the number from which" the call was placed).

Finally, none of these exhibits possess distinctive characteristics. *See* Fed. R. Evid. 901(b)(4). The transcripts possess no features that could distinguish them from any document produced by a word processor. Making matters worse is the fact no one transcript looks like the other. Indeed, the typefaces and font sizes of the words are inconsistent across the transcripts, as well as the labeling of the parties to the phone calls. Perhaps most disturbing are the frequent directions to "start," "stop," and "play" at either certain times or at no specified time. In addition, the two photographs of what Lorraine argues are text messages she received from Michelle provide no information regarding the sender or recipient of the text messages, aside from merely the name "Michelle."[23]

_____

her or Michelle's voice; Fed. R. Evid. 901(b)(5); there is no evidence a call was actually made to the number assigned to Michelle, Fed. R. Evid. 901(b)(6); and the recordings cannot be authenticated by distinctive characteristics because the writings on the sleeve and discs reveal almost nothing about the content of the discs and the recordings do not identify how they were created. Fed. R. Evid. 901(b)(4); *see also Scott v. County of San Bernadino*, EDCV 14-02490-VAP (KKx), 2016 WL 6609211, at *4 (C.D. Cal. Jan. 7, 2016) (finding an audio recording could not be authenticated in part because "[t]he compact disc in which the audio recording is contained does not bear any markings establishing the recording's authenticity" and "the audio recording itself does not identify how the recording was created"). The discs will not be considered.

[23] A similar issue plagues a purported letter sent from Lorraine to Romero. (See Doc. 185, Ex. 34.) This document does not contain any information regarding the recipient thereof. No reasonable jury could believe it is a letter and therefore the document is

The Court is mindful that a document can be authenticated based upon its contents "if they appear to be sufficiently genuine," *e.g.*, *Orr*, 285 F.3d at 778 n.24 (citing *United States v. One 56-Foot Yacht Named Tahuna*, 702 F.2d 1276, 1284-85 (9th Cir. 1983) (authenticating a diary based upon its contents)), and that the Advisory Committee has observed "a document or telephone conversation may be shown to have emanated from a particular person by virtue of its disclosing knowledge of facts known peculiarly to him." Fed. R. Evid. 901(b)(4), advisory committee's note to subdivision (b) of 1972 proposed rules. However, notwithstanding the fact some matters in the transcripts may not have been known by anyone other than Lorraine and Michelle, the aforementioned indicia of unreliability demonstrate they are inadmissible under FRE 901(b)(4).[24]

No reasonable jury could find these documents are what Lorraine says they are.[25] *See Smith*, 609 F.3d at 1301 ("The issue for the trial judge in determining whether the required foundation for the introduction of the evidence has been established is whether the proof is such that the jury, acting as reasonable [persons], could find its authorship as claimed by the proponent."). They will not be considered.

### E. Medical Records

Both Lorraine and State Defendants submitted medical records. Lorraine produced documents authored by her primary care provider, including a patient ledger and a report from April 2013 from Desert View Family Medicine. (Doc. 185, Ex. 28.) Both Lorraine

_____

inadmissible.

[24] Even if the transcripts or any of the other records contained in these documents were authenticated under FRE 901(b)(4), all of the documents contain inadmissible hearsay, as it appears Lorraine offers them to prove the truth of matters asserted therein.

In addition, even if Lorraine offers them for some non-hearsay purpose (such as notice) or they fall within a hearsay exception under FRE 803 or FRE 804, there is no evidence in the record any of State Defendants listened to the recordings or viewed the transcripts. At most, the evidence suggests they may have received them. (*See, e.g.*, Doc. 185, Exs. 40-42.)

[25] This analysis and finding applies with equal force to the portion of State Defendants' exhibit that includes these alleged transcripts. (Doc. 172-5, Ex. 25.) Indeed, even though State Defendants appear to have conceded the admissibility of the transcripts by offering them, there is nevertheless nothing on their face that suggests they are transcripts of conversations that took place. Unaccompanied by an affidavit, this portion of Doc. 172-2, Ex. 25 is inadmissible.

and State Defendants submitted a psychological evaluation report authored by Dr. Bluth, (Doc. 185, Ex. 18; Doc. 172-4, Ex. 16), as well as a CPS Case Evaluation Form completed by Dr. John P. DiBacco.  (Doc. 185, Ex. 30; Doc. 172-4, Ex. 20.)  Lorraine also submitted an article she wrote concerning her mental health called "The Family Court System and How it Affects your Mental Health."  (Doc. 185-2, Ex. 100.)  While none of these records are accompanied by an affidavit, all of them are authenticated based upon their distinctive characteristics.  *See* Fed. R. Evid. 904(b)(2).

However, the Bluth report—to the extent it is invoked by State Defendants— is plagued with inadmissible hearsay.  First, none of the statements by Dr. Bluth were made while "testifying" in this litigation.  *See* Fed. R. Evid. 801(c)(1).  Second, State Defendants offer a statement in the Bluth report to prove the truth of a matter asserted therein.[26]  *See* Fed. R. Evid. 801(c)(2).  To wit, State Defendants offer Dr. Bluth's statement that Lorraine said she has post-traumatic stress disorder ("PTSD") to prove "Patterson claims she has PTSD." (*See* Doc. 172 at 7.)

Finally, no hearsay exception applies.  While State Defendants conceivably could have argued the statement constitutes one made for medical diagnosis or treatment under FRE 803(4), this exception only applies to statements made *by* a patient, and not *to* a patient.  *See Bulthuis v. Rexall Corp.*, 789 F.2d 1315, 1316 (9th Cir. 1985) (per curiam) ("Rule 803(4) applies only to statements made by the patient to the doctor, not the reverse."); *see also Roness v. T-Mobile USA, Inc.*, Case No. C18-1030-RSM, 2019 WL 2918234, at *2 (W.D. Wash. July 8, 2019) ("Although Rule 803(4) excepts statements made for medical diagnosis or treatment, this rule does not except statements made by the person providing the medical attention to the patient."); *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 564 (7th Cir. 1996) ("Rule 803(4) does not purport to except, nor can it reasonably be interpreted as excepting, statements by the person providing the medical attention to the patient.").  Indeed, the Advisory Committee "anchors

---

[26] While Lorraine also offers her article and statements from the Dr. Bluth report and the Dr. DiBacco form, she does not offer them to prove the truth of an assertion.

- 21 -

the rule on the 'patient's strong motivation to be truthful,' something that has no application when the declarant is the doctor." 30B Charles Alan Wright, Arthur R. Miller & Jeffrey Bellin, *Federal Practice & Procedure* § 6847 (2018 ed.) (citing Fed. R. Evid. 803(4), advisory committee's note to paragraph (4) of 1972 proposed rules). As the statement was made by Dr. Bluth, FRE 803(4) does not apply and the statement is inadmissible.

## IV.  ANALYSIS

Lorraine's claim, brought under 42 U.S.C. § 1983, alleges State Defendants deliberately fabricated evidence and suppressed exculpatory evidence in violation of her Fourteenth Amendment due process rights.

### A.  Deliberate Fabrication of Evidence

"The Fourteenth Amendment protects parents' fundamental right to participate in the care, custody, and management of their children." *James v. Rowlands*, 606 F.3d 646, 648 (9th Cir. 2010) (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)). It also protects them from "deliberately fabricated evidence in civil child dependency proceedings" where their "protected familial liberty interest is at stake." *See, e.g.*, *Hardwick v. County of Orange*, 844 F.3d 1112, 1117 (9th Cir. 2017). "To prevail on a § 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017).

A plaintiff must first point to evidence she contends the government deliberately fabricated. *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015). This can be accomplished in one of two ways. First, a plaintiff can introduce direct evidence showing the defendant made "actual misrepresentations," such as evidence the defendant "deliberately falsified statements in her investigative report and declaration." *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010). Second, there are two circumstantial methods of proving a falsification was deliberate: (1) establishing the defendant continued his investigation of the plaintiff even though he knew or should have known that the plaintiff was innocent; or (2) establishing the defendant used "investigative

techniques that were so coercive and abusive" that he "knew or should have known that those techniques would yield false information." *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

To establish causation, a plaintiff must show "the act was the cause in fact of the deprivation of liberty, meaning that the injury would not have occurred in the absence of the conduct" and "the act was the proximate cause or legal cause of the injury, meaning that the injury is of a type that a reasonable person would see as a likely result of the conduct in question." *Spencer*, 857 F.3d at 798. However, "[e]rrors concerning trivial matters cannot establish causation. And fabricated evidence does not give rise to a claim if the plaintiff cannot show the fabrication actually injured her in some way." *Id.*

Lorraine alleges her liberty interest in the custody of Michelle was deprived by a finding of the Juvenile Court that was based upon evidence fabricated by State Defendants. As she must prove the allegedly fabricated evidence caused that court to issue its dependency determination, the only statements made by State Defendants that are actionable are those that were made to the Juvenile Court. Accordingly, any statements made by State Defendants that were not made to the Juvenile Court (or made by non-parties to the Juvenile Court) are irrelevant and will not be examined. For example, the Amended Dependency Petition is not actionable because it was filed not by one of State Defendants, but by Assistant Attorney General Abrienda Hansen. (*See* Doc. 172-3, Ex. 13.) In addition, the purported "false charges" Mathlin and Youngman disseminated to "counselors, schools and police," among others, are not actionable either because there is no evidence they were filed with the Juvenile Court. (*See* Doc. 89 at ¶¶ 72-73.)

The following documents were submitted to the Juvenile Court and contain statements made by State Defendants: the March 2013 Report; the May 2013 Report; the FCRB Report; the January 2014 Report; and the July 2014 Report. They shall be examined in turn.

### 1. The March 2013 Report

Although Lorraine generally alleges State Defendants "each submitted and/or supported untruths in reports to the court," she addresses the March 2013 Report neither in her response or in the Complaint. (*See* Doc. 89 at ¶ 125.) There is no evidence Romero and Nelson-McCall made deliberate fabrications therein. First, the statement provided under the "Reason for CPS Involvement" section and the subsection thereof titled "Why temporary custody was necessary" is merely a summary of the allegations in the March Dependency Petition. (Doc. 185, Ex. 10 ("The CPS Hotline received the following report on 03/13/2013: Private Dependency Petition received at the Child Abuse Hotline on 3/7/2013 in regards to Michelle. The dependency petition states . . . .").) There is no indication it speaks to the truth of the allegations. Second, even if it did, CPS had been provided ample notice of the allegations via the March Dependency Petition and numerous reports from the Hotline which referenced numerous sources. (*See* Doc. 172-1, Exs. 2, 4, 6.) Third, Lorraine has not provided any evidence that Romero or Nelson-McCall knew any of the information they provided in the report was untrue.

There is also no evidence the causation element is satisfied because the Juvenile Court did not deprive Lorraine of any constitutionally protected liberty at the hearing that immediately followed the filing of the March 2013 Report. At the March 15, 2013 hearing, the Juvenile Court did not enter any order regarding Lorraine's custody of Michelle. (Doc. 172-4, Ex. 19.) In fact, it dismissed the March Dependency Petition—which was filed not by ADES, but Morris—at the request of ADES. (Doc. 172-1, Ex. 2; Doc. 172-4, Ex. 19.) The March 2013 Report does not support Lorraine's deliberation fabrication claim.

### 2. The May 2013 Report

Lorraine alleges deliberate fabrications were made in the May 2013 Report by Romero and McCall. (Doc. 89 at ¶¶ 32; 48.) Specifically, she contends the statement provided under the "Reason for CPS Involvement" section and the subsection thereof titled "Why temporary custody was necessary" was false. (*See id.*)

There is no evidence that any statements made in the May 2013 Report were deliberately fabricated. First, the language under the "Reason for CPS Involvement" section and the subsection thereof titled "Why temporary custody was necessary," is, in relevant part, a summary of a report the Hotline received before the May 2013 Report was filed. (Doc. 172-2, Ex. 7 ("The CPS Hotline received the following report on 05/10/2013: Per documentation . . . .").) The plain language of the report shows this language was provided to apprise the Juvenile Court of the reason CPS became involved and nothing demonstrates it constitutes anything to the contrary. However, even if this language was provided to prove the truth of the allegations in the report, Romero and McCall had notice of a wealth of allegations from numerous sources concerning Lorraine and Michelle. (*See* Doc. 172-1, Exs. 4-6.) Moreover, while the record shows Lorraine shared her views regarding her case with Romero and may have submitted evidence before the May 2013 Report was filed, (Doc. 185, Ex. 35), this does not create a genuine issue as to whether Romero knew the information she wrote in the report was false. Simply because Romero, during the course of an ongoing investigation, received evidence that may have conflicted with the evidence she already had does not mean she knew her previously received evidence to be false. It only means she had conflicting evidence, which may have led to a dispute of fact for her or the Juvenile Court to resolve.

Patterson is correct that before the Juvenile Court issued its dependency determination, CPS ended its investigation and unsubstantiated its allegations that Lorraine neglected and emotionally abused Michelle. However, as State Defendants note, these allegations were unsubstantiated in June 2013—after Romero and McCall submitted the May 2013 Report. (Doc. 172-4, Ex. 17.) Further, ADES explicitly abandoned these allegations in the Amended Dependency Petition, (*see* Doc. 185, Exs. 23-24; Doc. 172-3, Ex. 13), and there is no evidence either State Defendants or anyone else "continued their investigation" regarding these allegations "despite the fact that they knew or should have known" they were unfounded. *See Devereaux*, 263 F.3d at 1076. Nor is there evidence either State Defendants or anyone else continued to press them before the Juvenile Court.

The Dependency Petition alleged Michelle was dependent solely because of Michelle's behaviors and noted that Michelle refused to return to Lorraine's home and refused to be parented by Lorraine. (Doc. 172-3, Ex. 13.) The allegation that Michelle refused to go home was, to be sure, listed in the complained-of section of the May 2013 Report. (Doc. 172-2, Ex. 7.) However, even if that section was provided to prove the truth of, in part, that allegation, there is no evidence Romero or any of State Defendants knew it to be untrue. Indeed, Michelle told Mathlin before the August 20, 2013 hearing that she did not want to be moved. (Doc. 185-1, Ex. 46.) There is no support for the proposition Romero and McCall made deliberate fabrications in the May 2013 Report.

Nor is there support for the proposition that any deliberate fabrications caused the Juvenile Court to find Michelle was dependent at the August 20, 2013 hearing. Because the Juvenile Court found Lorraine dependent solely due to her behaviors, the statement in the May 2013 Report regarding Lorraine's purported substance abuse, eating disorder, and medical ailments had no bearing on the Juvenile Court's finding. (*See* Doc. 172-4, Ex. 15.) It was irrelevant. *See Fregosi v. Dep't of Health and Human Servs.*, CASE NO. 3:18-cv-5440-RJB, 2019 WL 2502039, at *8 (W.D. Wash. June 17, 2019) (finding the plaintiff "failed to point to any evidence that the statements in the allegation section of the dependency proceeding lead [sic] to the deprivation of his liberty interest" because "[t]here is nothing in the record to suggest that the information Plaintiff says was false was introduced" at the juvenile court's dependency hearing and the juvenile court "did not discuss" that information "in her finding of dependency").

On the contrary, the statement in the May 2013 Report regarding Michelle's behaviors was relevant. Yet, even if that statement had been deliberately fabricated by Romero and McCall, there is no evidence the Juvenile Court made its finding based specifically upon that statement. Indeed, before making its finding, the Juvenile Court considered four exhibits submitted by ADES and testimony from Mathlin. It can hardly be said based on the Juvenile Court's record that the statement from the May 2013 Report

was the but-for cause of its finding, let alone the proximate cause. *See Spencer*, 857 F.3d at 798 (outlining the causation element).

There is also no support for the proposition that deliberate fabrications in the May 2013 Report caused any other deprivation of liberty. Lorraine alleges in the Complaint and argues in her response that she lost custody of Michelle at the May 14, 2013 hearing based upon the deliberate fabrications in the May 2013 Report. (*See, e.g.*, Doc. 89 at ¶ 45.) However, there is no indication the Juvenile Court made any decision regarding the custody of Michelle at the May 14, 2013 hearing. (Doc. 172-4, Ex. 14.) The Juvenile Court merely entered a denial to the May Dependency Petition on Lorraine's behalf and set the schedule for the rest of the dependency proceeding. (*Id.*) Moreover, the May 2013 Report suggests temporary custody of Michelle had already been taken. Indeed, in the section therein titled "Reason for CPS Involvement" and the subsection thereof titled "Describe the need, if any, for continued temporary custody," Romero wrote "*[c]ontinued* temporary custody is needed due to Michelle refusing to return home due to mom's behaviors." (Doc. 172-2, Ex. 7 (emphasis added).)

There is language, however, in the intake report dated May 16, 2013, that suggests a court may have issued an order regarding the temporary physical custody of Michelle:

> It is ordered that the child is placed in the temporary physical custody of Linda Morris. The court finds at this time, that continuation of the children in the home would be contrary to the welfare of the children based upon the contents of the verified petition alleging: risk of abuse or neglect, unfitness of the home environment for the children, substance abuse issues, mental health issues, and unwillingness or inability of the parents to care for the children.
>
> Based on the above information the court hearings are as follows:
>
> Preliminary Protective Conference is set for May 14, 2013 at 2:15pm and Preliminary Protective Hearing set for May 14, 2013, at 3:00pm . . . ."

(Doc. 172-1, Ex. 5.) As an initial matter, it is not clear whether a temporary physical custody order—as opposed to a dependency order—is actionable under Lorraine's deliberate fabrication claim. Yet, even if it is, this language also suggests any court order

regarding Michelle's custody was made prior to the May 14, 2013 hearing and there is no such order in the record.  (*Id.*)  Finally, even if the Court infers, viewing the evidence "in the light most favorable to the party opposing the motion," *see Matsushita*, 475 U.S. at 587, there is an order by the Juvenile Court concerning the temporary physical custody of Michelle, there is no evidence in the record that shows any statement in the May 2013 Report (or, for that matter, any report submitted by State Defendants) had any influence thereon.

Accordingly, the May 2013 Report does not support Lorraine's deliberate fabrication claim.

### 3.  The January 2014 Report and the FCRB Report

Both the January 2014 Report and the FCRB Report were submitted to and considered by the Juvenile Court during the January 21, 2014 hearing in which it found Michelle continued to be dependent.  (Doc. 185-1, Ex. 56.)  However, neither of them supports Lorraine's deliberate fabrication claim.

While Lorraine generally alleges State Defendants "each submitted and/or supported untruths in reports to the court," the January 2014 Report is the subject of neither an argument in Lorraine's response nor a specific allegation in the Complaint.  (*See* Doc. 89 at ¶ 125.)   The record demonstrates there is no evidence there were deliberate fabrications in the January 2014 Report.  On the contrary, it provides evidence that Mathlin and Youngman were given notice of Michelle's well-being and mental state from, at the very least, Dr. Bluth's report.  In his report, Dr. Bluth diagnosed Michelle with PTSD , reported she has "anxiety . . . related to emotional abuse in her family of origin," and recommended that she not be reunified with Lorraine unless Lorraine "has fully participated in the case plan and is demonstrating behavioral change."  (Doc. 172-4, Ex. 16.)  He also noted reunification would "be contingent on whether Michelle is desirous of being reunified with her mother."  (*Id.*)  Dr. Bluth's report is cited throughout the January 2014 Report.  (Doc. 172-2, Ex. 9.)

In contrast, the FCRB Report is the subject of a specific allegation in the Complaint. As an initial matter, statements in the FCRB Report itself are not actionable because the FCRB Report was not authored by any of State Defendants. (Doc. 172-4, Ex. 21.) However, as State Defendants appear to concede, a statement authored by Mathlin is attached to the FCRB Report. The face of the report supports this proposition as well. (*See id.* ("Joanne Mathlin Case Manager Written Statement Prior to the Review Please See Attachment").) While it is not clear the Juvenile Court considered this attachment, as opposed to just the report itself, (*see* Doc. 185-1, Ex. 56 ("The Court has read and considered . . . the FCRB report.")), the Court, viewing the evidence "in the light most favorable to the party opposing the motion," *see Matsushita*, 475 U.S. at 587, infers it did.

Lorraine alleges Mathlin falsely wrote in her statement that she failed to disclose her prior mental health history. (Doc. 89 at ¶ 85.) She cites an article she wrote concerning her depression titled "The Family Court System and How it Affects your Mental Health" and alleges her "then current Mental Health was clarified as stress by her PA of nine years." (*Id.*) However, while this article is in the record, (Doc. 185-2, Ex. 100), there is no evidence Mathlin ever received it, much less reviewed it. Nor is there any other evidence that shows Mathlin deliberately fabricated anything in her statement.

Even if there were deliberate fabrications in both the Mathlin statement and the January 2014 Report, there is insufficient evidence that any statement in either of these documents caused the Juvenile Court to find Michelle remained dependent. While the Juvenile Court "read and considered" both of these documents, it did not cite anything therein to justify its finding. (*See* Doc. 185-1, Ex. 56.) Moreover, the Juvenile Court also "read and considered" the FCRB Report, in which the FCRB noted Lorraine "has not demonstrated her commitment toward family reunification with Michelle," Michelle "does not desire to have contact" with Lorraine, and Lorraine "has not addressed the issues which brought Michelle into care." (Doc. 185-1, Ex. 56; Doc. 172-4, Ex. 21.) Given the number of statements made to the Juvenile Court through these three documents and the Juvenile Court's lack of specificity, there is no evidence for the proposition that a specific fact or

statement was both the cause in fact and the proximate cause of the Juvenile Court's finding. *See Spencer*, 857 F.3d at 798 (explaining the causation element). Neither the January 2014 Report nor Mathlin's statement in the FCRB Report support Lorraine's deliberate fabrication claim.

### 4. The July 2014 Report

Although Lorraine does not appear to address the July 2014 Report in her response, she alleges in the Complaint that the July 2014 Report "states untruths" by providing "per documentation the mother was neglecting her child due to substance abuse and/or mental illness. The mother has substance abuse issues involving prescription medications . . . ."[27] (*See* Doc. 89 at ¶ 105.) This allegation—and therefore Lorraine's claim as it relates to the July 2014 Report—fails. First, there are multiple problems regarding the causation element. At the outset, there is no evidence the Juvenile Court considered the July 2014 Report at the July 15, 2014 hearing. Indeed, the Juvenile Court stated "[t]he Court has read and considered the DCS caseworker's report dated 8/10/14." (Doc. 185-1, Ex. 59.) However, no report dated August 10, 2014 appears in the record. Perhaps more importantly, none of the orders issued by the Juvenile Court during that hearing deprived Lorraine of any constitutionally protected liberty. In fact, the Juvenile Court dismissed the dependency action. (*Id.*)

Second, even if the causation element were somehow met, there is no evidence those responsible for submitting the July Report 2014, Mathlin and Youngman, deliberately fabricated evidence. As previously explained, the language Lorraine cites in her allegation, is—by virtue of the plain language of the report—a summary of a report the Hotline received. This view is further supported by the first line of the subsection in question, which Lorraine omits: "[t]he CPS Hotline received the following report on 05/10/2013."

---

[27] While this is not the precise language that appears in the July 2014 Report, it is materially similar. (*See* Doc. 172-2, Ex. 10.)

(*See* Doc. 172-2, Ex. 10.)  The July 2014 Report therefore does not support Lorraine's deliberate fabrication claim.[28]

### B.  Suppression of Exculpatory Evidence

#### 1.  Legal Framework

The legal underpinning of Lorraine's deliberation fabrication claim, as it relates to her allegations that State Defendants suppressed exculpatory evidence, is not entirely clear. First, the elements of this claim do not, on their face, contemplate a suppression of evidence as being actionable.  *See Spencer*, 857 F.3d at 798 ("To prevail on a § 1983 claim of deliberate *fabrication*, a plaintiff must prove that (1) the defendant official deliberately *fabricated* evidence and (2) the deliberate *fabrication* caused the plaintiff's deprivation of liberty." (emphases added)).  Indeed, the term "suppressed" (as well as related terms such as "omitted") is nowhere to be found.  Moreover, the relevant definition of the word "fabricate"—"[t]o invent, forge, or devise falsely"—cannot easily be reconciled with that of the word "suppress"—"to prevent (something) from being seen, heard, known, or discussed."  *See Fabricate*, Black's Law Dictionary (11th ed. 2019); *Suppress*, Black's Law Dictionary (11th ed. 2019).

This cause of action, however, may accommodate suppression allegations because it incorporates the elements of another—judicial deception.  To support a judicial deception claim, some courts find "a plaintiff must show that the defendant deliberately or recklessly made false statements *or omissions* that were material to the finding of probable cause,"

---

[28] As the Court of Appeals recognized, Lorraine also alleges State Defendants submitted "a fabricated case plan dated January 5, 2014." *Patterson v. Miller*, 741 F. App'x 416, 417 (9th Cir. Oct. 26, 2018).  Specifically, Lorraine alleges this case plan was submitted on July 3, 2014.  (Doc. 89 at ¶ 103.)  However, there is no evidence this case plan, (Doc. 172-5, Ex. 22), was ever filed with the Juvenile Court.  Indeed, there is no evidence on the face of the case plan or any other document that demonstrates the case plan was filed.  While the prompt for section III.D. of the July 2014 Report includes the instruction "attach case plan," this does not indicate a case plan was actually attached, let alone the case plan in question. (*See* Doc. 172-2, Ex. 10.)  Moreover, even if the case plan had been filed, it does not support Lorraine's deliberate fabrication claim for the same reasons why the July 2014 Report does not.

*see, e.g.*, *Greene v. Camreta*, 588 F.3d 1011, 1035 (9th Cir. 2009) (emphases added), *vacated in part as moot*, 563 U.S. 692 (2011) *and vacated in part on other grounds*, 661 F.3d 1201 (9th Cir. 2011), while others find a plaintiff "must make a substantial showing of deliberate falsehood or reckless disregard for the truth and establish that but for the dishonesty, the challenged action would not have occurred." *See, e.g.*, *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) (quoting Hervey v. Estes, 65 F.3d 784, 788-89 (9th Cir. 1995)). However formulated, these elements are strikingly similar, and, perhaps not surprisingly, other district courts in the Ninth Circuit have found they are identical. *See, e.g.*, *Richardson v. Schubert*, No 3:14-cv-01027-ST, 2015 WL 4627938, at *8 (D. Ore. Aug. 3, 2015) ("Plaintiffs have a Fourteenth Amendment due process right to be free from deliberately fabricated evidence in a civil child abuse proceeding. This is also referred to as a claim for judicial deception."); *see also Reynolds v. County of San Diego*, 224 F. Supp. 3d 1034, 1054-57 (S.D. Cal. 2016) (employing the elements of a "judicial deception" claim and a "deliberate fabrication of evidence claim" to analyze a claim alleging a social worker and her supervisor "fabricated evidence in their investigation" and "failed to provide the juvenile court with exculpatory evidence"), *rev'd in part on other grounds sub nom. Reynolds v. Bryson*, 716 F. App'x 668 (9th Cir. Mar. 23, 2018).

Yet, not all courts agree. *See, e.g.*, *Jackson v. Placer County*, No. CIV S0579FCDKJM., 2005 WL 1366486, at *4 n.5 (E.D. Cal. May 27, 2005) ("[P]laintiff does not base this claim on allegations of deliberate fabrication of evidence by the government or deception under *Devereau* [sic] *v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) or *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002)."). Meanwhile, a recent decision noted a deliberate fabrication claim "is also referred to as a claim for judicial deception," yet applied the elements for a deliberate fabrication claim to analyze one challenged action and the elements of a judicial deception claim to analyze another. *Worley v. Brewer*, Case No.: 3:16-cv-2412-AC, 2019 WL 237387, at *5-9 (D. Ore. Jan. 16, 2019) (analyzing elements of the former claim with regard to allegations a defendant "concocted false claims"

regarding internet videos and the latter claim with regard to allegations a defendant "made false and misleading statements" in an affidavit).

Second, suppression of evidence allegations call to mind claims brought under *Brady v. Maryland*, 373 U.S. 83 (1963). *Cf. Ramirez v. County of Los Angeles*, 397 F. Supp. 2d 1208, 1226 (C.D. Cal. 2005) ("Det. Bravo also moves for summary judgment on Plaintiff's two § 1983 claims for fabricating evidence (*Devereaux*) and withholding evidence (*Brady*)."). There, the Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. As the Court of Appeals recently explained, "[t]he extent to which *Brady*-like obligations extend to civil cases is an open question." *Kashem v. Barr*, 941 F.3d 358, 386 (9th Cir. 2019). *Brady* has been applied in civil actions "when a substantial private interest is at stake." *Id.* at 386-87 (citing *Maqaleh v. Hagel*, 738 F.3d 312, 327 (D.C. Cir. 2013), *vacated in part on other grounds sub nom. Al-Najar v. Carter*, 575 U.S. 908 (2015)). Nevertheless, "courts have only in rare instances found *Brady* applicable in civil proceedings, such as when a person's liberty is at stake." *Id.* at 387 (citing *Fox ex rel. Fox v. Elk Run Coal Co.*, 739 F.3d 131, 138 (4th Cir. 2014); *Brodie v. U.S. Dep't of Health & Human Servs.*, 951 F. Supp. 2d 108, 118 (D.D.C. 2013), *aff'd*, No. 13-5227, 2014 WL 211222 (D.C. Cir. Jan. 10, 2014)). "It is not clear whether the *Brady* rule applies to civil child dependency proceedings." *E.g.*, *A.M.K. v. Contra Costa County*, Case No. 18-cv-06004-DMR, 2019 WL 4601606, at *12 (N.D. Cal. Sept. 23, 2019). Moreover, the Supreme Court, in dicta, recently noted *Brady* claims "rank within the traditional core of habeas corpus and outside the province of § 1983." *Skinner v. Switzer*, 562 U.S. 521, 536 (2011).

While Lorraine obviously had a substantial interest at stake in the dependency proceeding—her custody over Michelle—it is less obvious her liberty was at stake. Indeed, as the Arizona Court of Appeals explained, her "willingness to parent her child is not an absolute defense because dependency concerns the status of the child regardless of any

fault on the part of the parent." *Lorraine P. v. Ariz. Dep't of Econ. Sec.*, No. 1 CA-JV 13-0227, 2014 WL 641856, at *2 (Ct. App. Feb. 18, 2014) (citing *In re Appeal in Maricopa County, Juvenile Action No. J-75482*, 111 Ariz. 588, 590, 536 P.2d 197, 199 (1975) (en banc)).

While the legal basis for Lorraine's suppression allegations is nebulous, they are within the scope of her deliberate fabrication claim. Notwithstanding the conflicting district court opinions and the lack of explicit guidance from the Court of Appeals, the Court of Appeals recently conflated deliberate fabrication claims with judicial deception claims. Indeed, in *Keates*, the Court of Appeals recited the elements of a deliberate fabrication claim to describe a judicial deception claim. *See Keates*, 883 F.3d at 1240 ("We now turn to Keates's and A.K.'s claim that the defendants violated their due process right to be free from deliberately false statements during juvenile court proceedings. In order to prevail on a judicial deception claim, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty. (citing *Spencer*, 857 F.3d at 798)). Moreover, a year earlier, the Court of Appeals, in determining whether the "right to be free from deliberately fabricated evidence in civil child dependency proceedings" was clearly established in February 2000, extensively discussed *Greene*, a judicial deception case that found such claims apply to omissions. *Hardwick*, 844 F.3d at 1117-18; *Greene*, 588 F.3d at 1034-35. Lorraine's suppression allegations are therefore actionable, as they are within the scope of her deliberate fabrication claim. As Lorraine can prosecute these allegations without raising a *Brady* claim, the Court accordingly expresses no opinion regarding whether *Brady* obligations are applicable in dependency proceedings.

## 2. Application

Although Lorraine's suppression allegations are actionable under her deliberate fabrication claim, they nevertheless fail. Lorraine argues State Defendants suppressed various documents—including, but not limited to, her e-mails to State Defendants, (*e.g.*, Doc. 185, Ex. 35), documents authored by her primary care provider, (Doc. 185, Ex. 28),

and transcripts of telephone conversations between her and Michelle[29]—that would have disproved allegations in the reports filed by State Defendants or otherwise exculpated her. However, because Lorraine had access to, possessed, or had the opportunity to present all of these documents, State Defendants did not suppress or improperly omit anything. *See Reynolds*, 224 F. Supp. 3d at 1056 (rejecting a claim that social workers failed to provide a juvenile court with exculpatory evidence in part because plaintiffs "were well aware of the exculpatory evidence and had the opportunity to put forth any exculpatory evidence on their own behalf").

The record demonstrates Lorraine or her counsel submitted many, if not all, of these documents to State Defendants or counsel thereto. In contrast, there is no evidence State Defendants had access to or possessed any exculpatory evidence that Lorraine did not already have. Moreover, neither she nor her counsel filed any documents with the Juvenile Court prior to the hearing at which the dependency determination was made and failed to present any exhibits at the hearing, despite having the opportunity to do so.[30] She also did not testify at the hearing, even though one of State Defendants, Mathlin, did. (Doc. 172-4, Ex. 15.) When Lorraine moved for an evidentiary hearing after the Juvenile Court announced its finding, the Juvenile Court denied the motion. (*Id.*) In addition, Lorraine later submitted a trove of documents with both the Juvenile Court, (Doc. 172-3, Ex. 12) and the Arizona Court of Appeals. (Doc. 185-1, Ex. 58 at 2.) Lorraine has presented no authority that holds a social worker must present exculpatory evidence that a plaintiff has access to or possesses. Given the record, Lorraine's suppression allegations do not hold water.

While it is unclear whether State Defendants were subject to *Brady* obligations, certain aspects of the *Brady* doctrine are nevertheless instructive. The Court of Appeals has held "where the defendant is aware of the essential facts enabling him to take advantage

---

[29] For the reasons stated in section II.D., *supra*, these transcripts, along with other related items, (Doc. 185-1, Exs. 65-71), are inadmissible and shall not be considered.

[30] Indeed, ADES submitted four exhibits and while Lorraine had four exhibits marked for identification, none of them were admitted into evidence. (Doc. 172-4, Ex. 15.)

of any exculpatory evidence, the Government does not commit a *Brady* violation by not bringing the evidence to the attention of the defense." *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006). In *Raley*, the defendant possessed the facts regarding the records he claimed were withheld and the Court of Appeals accordingly rejected his *Brady* claim. *Id.* Especially relevant is *Clarke*, in which the plaintiff alleged a *Brady* violation against two social workers. *Clarke v. Upton*, No. CV-F-07-888 OWW/SMS, 2009 WL 1460815, at *1, 18 (E.D. Cal. May 26, 2009). The court, which assumed, *arguendo*, that *Brady* applies to child civil dependency proceedings, rejected the plaintiff's *Brady* allegation, reasoning the plaintiff knew of the exculpatory evidence he referenced and that "[n]othing prevented Plaintiff from advising the state court of the existence of the alleged evidence." *Id.* at 19.

The *Raley* doctrine and its progeny further cut against Lorraine's suppression allegations. Lorraine knew of both the exculpatory evidence she now argues was suppressed by State Defendants and the essential facts underlying it. (*E.g.*, Doc. 185, Ex. 35.) Meanwhile, there is no evidence that establishes Lorraine was prevented from advising the Juvenile Court of the evidence; in fact, after the dependency determination was made, she did just that. (*See* Doc. 172-4, Ex. 15.) Lorraine's suppression allegations are not supported by the record.

IT IS THEREFORE ORDERED that the Defendants' Motion for Summary Judgment (Doc. 172) is granted.

IT IS FURTHER ORDERED that the Clerk of the Court enter judgment in favor of Defendants against Plaintiff Lorraine Patterson and that Plaintiff take nothing.

IT IS FURTHER ORDERED that the Clerk terminate this case.

Dated this 3rd day of April, 2020.

_____
Neil V. Wake
Senior United States District Judge